(Slip Opinion)

# Authority of the Department of Defense to Use Appropriations for Travel by Service Members and Dependents to Obtain Abortions

The Department of Defense may lawfully expend funds to pay for service members and their dependents to travel to obtain abortions that DoD cannot itself perform due to statutory restrictions. DoD may lawfully expend funds to pay for such travel pursuant to both its express statutory authorities and, independently, the necessary expense doctrine.

October 3, 2022

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
DEPARTMENT OF DEFENSE

You have asked whether the Department of Defense ("DoD") may lawfully expend funds to pay for service members and their dependents to travel to obtain abortions that DoD itself cannot perform due to statutory restrictions. We conclude that DoD may lawfully expend funds for this purpose under its express statutory authorities and, independently, under the necessary expense doctrine.

## I.

By statute, "[f]unds available to the Department of Defense may not be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term or in a case in which the pregnancy is the result of an act of rape or incest," 10 U.S.C. § 1093(a), and "[n]o medical treatment facility or other facility of the Department of Defense may be used to perform an abortion except where the life of the mother would be endangered if the fetus were carried to term or in a case in which the pregnancy is the result of an act of rape or incest," *id.* § 1093(b). By its express terms, 10 U.S.C. § 1093(a) applies only to funds used to "perform abortions." As we have previously concluded in assessing identical language restricting the Peace Corps' use of its appropriations, the plain text is dispositive here. *See Peace Corps Employment Policies for Pregnant Volunteers*, 5 Op. O.L.C. 350, 357 (1981). This language "does not prohibit the use of funds to pay expenses, such as a per diem or travel expenses, that are incidental to the abortion." *Id.*

This conclusion is confirmed by section 1093's legislative history. When Congress originally enacted the provision in 1984, it prohibited DoD only from using funds "to perform abortions except where the life of the mother would be endangered if the fetus were carried to term." Pub. L. No. 98-525, § 1401(e)(5), 98 Stat. 2492, 2617–18 (1984). DoD subsequently adopted a policy of prohibiting non-covered abortions from being performed at any DoD facility even when privately funded—a policy that President Clinton then directed DoD to reverse, stating that it went "beyond . . . the requirements of the statute." *Memorandum on Abortions in Military Hospitals*, 1 Pub. Papers of Pres. William J. Clinton 11, 11 (Jan. 22, 1993). In 1996, Congress responded to President Clinton's directive by amending 10 U.S.C. § 1093 to make clear that, in addition to the prohibition on using funds to "perform abortions," "[n]o medical treatment facility or other facility of the Department of Defense may be used to perform an abortion except where the life of the mother would be endangered if the fetus were carried to term or in a case in which the pregnancy is the result of an act of rape or incest." 10 U.S.C. § 1093(b). It is notable that the amendment was targeted narrowly to address the specific issue of DoD's use of its medical treatment facilities, rather than reaching the same result via a broader prohibition on expenditures indirectly related to the provision of abortions.

The limited scope of the 1996 amendment is especially significant because when Congress has wanted to restrict abortion-related expenditures beyond those for the procedure itself, Congress has done so. For example, in 1988—prior to amending 10 U.S.C. § 1093—Congress had attached a restriction to Department of Justice ("DOJ") funds prohibiting the use of those funds "to require any person to perform, *or facilitate in any way the performance of*, any abortion." Pub. L. No. 100-459, tit. II, § 206, 102 Stat. 2186, 2201 (1988) (emphasis added); *see also, e.g.*, Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, div. E, § 726(d), 136 Stat. 49, 131 ("CAA 2022") (referring to funding for "abortion *or abortion-related services*" (emphasis added)). This DOJ restriction is also in the current appropriation. *See* CAA 2022, div. B, § 203. That Congress chose not to include such capacious language in the 1996 amendment confirms that it did not intend for the prohibition to sweep so widely.

Other DOJ appropriation restrictions provide further evidence that Congress did not intend DoD's prohibition on the use of funds to perform abortions to reach ancillary expenses, such as travel costs. In addition to

the provision noted above, section 202 of the current appropriation contains a general prohibition against using the appropriated funds "to pay for an abortion." *Id.*, div. B, § 202. Section 204 then contains a clarification that the prohibition on requiring any person to perform or facilitate an abortion does not "remove the obligation of the Director of the Bureau of Prisons to provide escort services necessary for a female inmate" to obtain an abortion "outside the Federal facility." *Id.*, div. B, § 204. Importantly, this language in section 204 does not also create an exception to the general funding restriction in section 202, but rather only clarifies that nothing in section 203 "remove[s] the obligation" of the agency to provide transportation services. *Id.* Section 204 therefore is premised on an understanding that section 202's general prohibition on "pay[ing] for an abortion" does not affect the agency's ability to provide such escort services, showing that when Congress prohibits funds from being used "to pay for an abortion," it does not intend that prohibition to reach transportation expenses.

Comparing 10 U.S.C. § 1093 to the text and history of the longstanding funding restriction known as the Hyde Amendment is similarly instructive. The Hyde Amendment restricts expenditures by the Departments of Labor, Health and Human Services, and Education by providing that no covered funds "shall be expended for any abortion" or "for health benefits coverage that includes coverage of abortion," except "if the pregnancy is the result of an act of rape or incest; or . . . in the case where a woman suffers from a physical disorder, physical injury, or physical illness, including a life-endangering physical condition caused by or arising from the pregnancy itself that would, as certified by a physician, place the woman in danger of death unless an abortion is performed." CAA 2022, div. H, §§ 506–507. In previous advice, we concluded that the Hyde Amendment would not bar the use of appropriated funds to provide transportation for women seeking abortions. *See* Memorandum for Samuel Bagenstos, General Counsel, Department of Health and Human Services, from Christopher H. Schroeder, Assistant Attorney General, Office of Legal Counsel, *Re: Application of the Hyde Amendment to the Provision of Transportation for Women Seeking Abortions* (Sept. 27, 2022). In reaching that conclusion, we noted, among other considerations, that earlier versions of the Hyde Amendment only applied to funds "for any abortion," and that in 1997 Congress added language to reach funds "for

health benefits coverage that includes coverage of abortion."[1] Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 1998, Pub. L. No. 105-78, § 509(a)–(b), 111 Stat. 1467, 1516 (1997); *see Application of the Hyde Amendment to Federal Student-Aid Programs*, 45 Op. O.L.C. __, at *3 (Jan. 16, 2021); H.R. Rep. No. 105-390, at 119 (1997) (Conf. Rep.); *see also* 143 Cong. Rec. 17,448 (1997) (statement of Sen. Ashcroft). In the context of health insurance, the funds are paid to reimburse the provider or the insured for, and thus effectively pay for, the abortion procedure itself. As a result, payment for health insurance that covers abortions is more closely connected to the actual provision of abortion than transportation to and from the procedure. Thus, the fact that Congress revised the Hyde Amendment to specify that it applies to payments for health benefits coverage supports the view that the prohibition on expending funds "for any abortion" is limited to the direct provision of abortions and would not apply to transportation.[2] More generally, the amendment suggests that when Congress has wanted to clearly encompass certain expenditures beyond the direct provision of the procedure, Congress has amended abortion-related funding restrictions to do so.

For these reasons, 10 U.S.C. § 1093 does not prohibit the use of funds for expenses that are indirect or ancillary to the performance of abortion. We therefore conclude that 10 U.S.C. § 1093 does not bar DoD from using appropriated funds to pay for service members and their dependents to travel to obtain abortions that DoD cannot fund directly.

---

[1] Although the various appropriation restrictions use somewhat different language, *compare* 10 U.S.C. § 1093(a) (prohibiting "perform[ing] abortions") *with* CAA 2022, div. H, § 506(a) (prohibiting "expend[ing]" funds "for any abortion") *and id.*, div. B, § 202 (prohibiting "pay[ing] for an abortion"), we have concluded that in this context the differences in phrasing do not reflect differences in substance. *See Application of the Hyde Amendment to the Provision of Transportation for Women Seeking Abortions* at *3.

[2] To be sure, some of the legislative history suggests that this amendment simply "clarif[ied]" what the Hyde Amendment already prohibited. 143 Cong. Rec. 18,493 (1997) (statement of Rep. Hyde). Regardless, the debate—and Congress's subsequent action—indicate that the prohibition on funds being "expended for any abortion" did not sweep beyond the direct provision of abortions to an extent that would reach transportation for abortion.

## II.

The Constitution mandates that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. The Purpose Act, reflecting this constitutional principle, provides that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a). Consistent with the Purpose Act, the Supreme Court has long recognized that "[t]he established rule" is that "the expenditure of public funds is proper only when authorized by Congress, not that public funds may be expended unless prohibited by Congress." *United States v. MacCollom*, 426 U.S. 317, 321 (1976).

Accordingly, in the absence of a statute prohibiting the expenditures DoD is contemplating, the availability of the proposed expenditures depends on whether authority exists for DoD to expend its appropriations for this purpose. You have concluded that DoD has authority for the contemplated expenditures under both express statutory authorities and the necessary expense doctrine. We agree.

## A.

You have concluded that "the Secretary of Defense has broad statutory authority to pay for the travel and transportation expenses of Service members and other authorized travelers." Memorandum from Department of Defense, *Re: Legal Availability of DoD Appropriations to Pay Transportation Costs to Obtain Abortions Outside the Scope of 10 U.S.C. § 1093* at 3 (Aug. 22, 2022) ("*DoD Memo*"). You have noted three sources of statutory authority that you believe permit the Secretary of Defense to authorize the contemplated expenditures: 37 U.S.C. § 452(a), 37 U.S.C. § 452(b)(11), and 37 U.S.C. § 453(d). We agree that these provisions confer express authority for such expenditures.

### 1.

By its express terms, 37 U.S.C. § 452(a) provides broad authority for the Secretary to provide "actual and necessary expenses of travel and transportation, for, or in connection with," any "travel as authorized or ordered by the administering Secretary," *id.* § 451(b)(1), with no enumerated limitations.

The broad scope of 37 U.S.C. § 452(a)'s grant of authority to the Secretary to provide travel expenses is confirmed by a list of examples of covered travel expenses in 37 U.S.C. § 452(b)(1)–(20). This list is explicitly illustrative, not exclusive. *See id*. § 452(b) (noting that "[t]he authority under subsection (a) includes travel under or in connection with, but not limited to, the following circumstances"). Of particular note, 37 U.S.C. §§ 452(b)(18) and 452(b)(19) authorize expenses for travel by dependent children of a service member to the continental United States to attend school if the service member is assigned to a permanent duty location outside the continental United States. These provisions demonstrate that, consistent with the broad terms of the statutory definition, Congress understood "official travel" to include travel for purely personal purposes necessitated by the fact that service members and their families "generally do not choose where they and their families will be stationed," but are assigned to locations "based on the needs of the Military Service and the ability of Service members to meet those requirements." *DoD Memo* at 7.

Relevant legislative history further confirms that Congress intended the delegation of authority to the Secretary in 37 U.S.C. § 452(a) to be construed broadly. One of the purposes of the travel and transportation authorities for the uniformed services, including both 37 U.S.C. §§ 452 and 453, was to provide the Secretary with flexibility to authorize travel expenses in the face of changing needs. *See* National Defense Authorization Act for Fiscal Year 2012, Pub. L. No. 112-81, § 631(a), 125 Stat. 1298, 1452 (2011).

As such, both the text of 37 U.S.C. § 452 and its purpose indicate that 37 U.S.C. § 452(a) provides the Secretary with broad authority to provide payment for expenses in connection with authorized travel. Should the Secretary authorize travel for service members and their dependents to obtain abortions, 37 U.S.C. § 452(a) would expressly permit the provision of travel expenses.

**2.**

In addition, 37 U.S.C. § 452(b)(11) provides that the authority under 37 U.S.C. § 452(a) specifically "includes travel under or in connection with[] . . . [u]nusual, extraordinary, hardship, or emergency circumstances." A separate statute, 37 U.S.C. § 453(d), similarly provides that authorized travelers, including both service members and their dependents, *see*

*id.* § 451(a)(2), "may be provided travel and transportation allowances under this section for unusual, extraordinary, hardship, or emergency circumstances, including circumstances warranting evacuation from a permanent duty assignment location," *id.* § 453(d).[3] Neither provision specifies what constitutes "[u]nsual, extraordinary, hardship, or emergency circumstances." *Id.* § 452(b)(11); *see also id.* § 453(d).

Consistent with your representations, discussed further below, that being stationed in a location without access to abortion "may impose significant costs on a Service member's physical and mental health and well-being," *DoD Memo* at 7, you have concluded that "the Secretary of Defense or an authorized delegate could reasonably determine that Service members who are required to serve in an area without access to essential reproductive health care face unusual, extraordinary, hardship, or emergency circumstances," *id.* at 4 (quotation marks and alteration omitted) (citing 37 U.S.C. § 453(d) and 37 U.S.C. § 452(b)(11)). We agree.

There is precedent for the armed forces recognizing that service members and their families may experience hardship circumstances by virtue of being stationed in locations without access to specialized reproductive health care. A current Army policy provides several accommodations for service members when they or their spouses "are undergoing fertility treatment," including potential eligibility for compassionate reassignment to installations where fertility treatment is available. Christine E. Wormuth, Secretary of the Army, *Army Directive 2022-06* (*Parenthood, Pregnancy, and Postpartum)* at 7–8 (Apr. 19, 2022) ("*Army Directive 2022-06*"). The policy also allows service members to remain in the same geographic location for up to 365 days from the date of the first fertility appointment, with an additional 365-day extension from the date the service member is granted a fertility profile for assisted reproductive technology procedures. *Id.* The policy references a DoD Instruction providing that "[m]ilitary personnel assignment decisions will not be

---

[3] You have explained that 37 U.S.C. §§ 452(b)(11) and 453(d) differ in that funding authorized under 37 U.S.C. § 452 would typically apply across all the uniformed services and be implemented through an amendment to the Joint Travel Regulations in consultation with the Secretaries of Homeland Security, Commerce, and Health and Human Services, *see* 37 U.S.C. § 464, while 37 U.S.C. § 453(d) authorizes the Secretaries of Defense, Homeland Security, Commerce, and Health and Human Services to provide supplemental travel and transportation allowances for their respective uniformed services, *see id.* § 453; *DoD Memo* at 3–4.

influenced by the . . . health of a Service member's family member," except "[w]hen necessary to," among other things, "relieve the personal hardship of a Service member or family member because a family member needs access to specialized medical treatment." DoD Instruction 1315.18, *Procedures for Military Personnel Assignments* para. 3.b.1 (Oct. 28, 2015). In like vein, here DoD would be determining that service members and their families may experience hardship circumstances by virtue of being stationed in locations without access to specialized reproductive health care. The two contexts are especially similar because DoD does not provide or pay for either type of health care. *See* 32 C.F.R. § 199.4(e)(2) (excluding from DoD's medical insurance program payment for non-covered abortions); *id.* § 199.4(e)(3)(i)(B)(3) (excluding many assisted reproductive technologies, including artificial insemination and in vitro fertilization).

In light of the above, we conclude that the Secretary or an authorized delegate, taking into account all relevant considerations, could reasonably determine that requiring service members and their families to live in a location without access to abortion creates an unusual, extraordinary, hardship, or emergency circumstance. If the Secretary or an authorized delegate should make such a determination, 37 U.S.C. § 452(b)(11) and 37 U.S.C. § 453(d) would expressly authorize the provision of travel expenses for a service member or dependent to obtain that care.

## B.

Apart from relying on express statutory authority, an agency may expend funds from a general appropriation under the necessary expense doctrine. The necessary expense doctrine permits an agency to expend funds from a general appropriation "'[i]f the agency believes that [an] expenditure bears a logical relationship to the objectives of the general appropriation, and will make a direct contribution to the agency's mission,'" where no "specific provision limits the amount that may be expended on a particular object or activity within [the] general appropriation." *Use of General Agency Appropriations to Purchase Employee Business Cards*, 21 Op. O.L.C. 150, 153–54, 156 (1997) ("*Employee Business Cards*") (quoting *Indemnification of Department of Justice Employees*, 10 Op. O.L.C. 6, 8 (1986)). Agencies "have considerable discretion in determining whether expenditures further the agency's

authorized purposes and therefore constitute proper use of general or lump-sum appropriations." *Id.* at 153; *see Lincoln v. Vigil*, 508 U.S. 182, 192 (1993). It is for "[t]he agency itself " to "'make the required determination,' since [the agency] is 'in the best position to determine whether' an expenditure of funds is necessary to carry out the agency's mission effectively." *Religious Seasonal Decorations in Federal Government Buildings*, 45 Op. O.L.C. __, at *6 (Jan. 15, 2021) (quoting *State and Local Deputation of Federal Law Enforcement Officers During Stafford Act Deployments*, 36 Op. O.L.C. 77, 90 (2012)).

You have explained that the contemplated expenditure for travel expenses to help service members and their dependents access non-covered abortions "would rely on an operation and maintenance (O&M) appropriation, which is available for 'expenses, not otherwise provided for, necessary for the operation and maintenance' of the Department, 'as authorized by law.'" *DoD Memo* at 4 (quoting CAA 2022, div. C). "This appropriation is a general or lump-sum appropriation 'covering a wide range of activities without specifying precisely the objects to which the appropriation may be applied.'" *Id.* (quoting *Funding for the Critical Technologies Institute*, 16 Op. O.L.C. 77, 80 (1992)). You have concluded that "the necessary expense doctrine permits DoD to use its . . . appropriations to pay for Service members and dependents to travel to obtain non-covered abortions if a responsible senior official determines that the expenditures would make a direct contribution to the objectives of achieving and maintaining a ready force and/or recruiting and retaining a highly qualified force." *Id.* at 10. We agree.

DoD plainly has an interest in the readiness of its force, which it defines as the "ability of military forces to fight and meet the demands of assigned missions." *Id.* at 6 (quoting Office of the Chairman of the Joint Chiefs of Staff, DOD Dictionary of Military and Associated Terms at 179 (May 2022)). You have identified both individual medical readiness and morale as aspects of force readiness that could be furthered by the contemplated expenditure.

DoD defines medical readiness as "[a] Service member's medical, dental, and mental/behavioral health status necessary to perform their assigned missions." DoD Instruction 6025.19, *Individual Medical Readiness Program* at 24 (July 13, 2022) ("DoDI 6025.19, *Individual Medical Readiness Program*"). You have identified several reasons why "[f]unding

a Service member's transportation to and from a non-covered abortion procedure could contribute meaningfully to readiness, such that the expenditure helps accomplish 'broader [DoD] objectives' covered by the O&M appropriations." *DoD Memo* at 7.

First, as the Under Secretary of Defense for Personnel and Readiness and the Acting Assistant Secretary of Defense for Health Affairs recently testified before the House Armed Services Subcommittee on Personnel, "[r]egardless of whether and where abortion is legal, and under what circumstances, we know from established research that individuals will continue to seek" abortion care, including within "the Military Community." *Women's Reproductive Health Issues: Hearing Before the Subcomm. on Personnel of the H. Armed Services Comm.* at 4 (July 29, 2022) (statement of Gilbert R. Cisneros, Under Secretary of Defense for Personnel and Readiness, and Seileen Mullen, Acting Assistant Secretary of Defense for Health Affairs) ("*Cisneros Testimony*"). To obtain a non-covered abortion, service members or their family members who are stationed in states without local access from licensed providers would need to travel to another jurisdiction where the procedure is available, despite potentially burdensome or prohibitive costs of travel and lodging. *See id.* "Such expenses would add financial burden and stress to what is already likely to be a challenging situation," *DoD Memo* at 7, which could further exacerbate negative impacts on service members' physical and mental health.

Moreover, service members who are unable to afford the added expense "might instead obtain abortions from unlicensed local providers or even resort to self-help, which could put Service members' health at risk and expose them to potential liability or jeopardy under state law." *Id.* Others "may be forced to carry unwanted pregnancies to term, 'transform[ing] what, when freely undertaken, is a wonder into what, when forced, may be a nightmare.'" *Id.* (alteration in original) (quoting *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2318 (2022) (Breyer, Sotomayor, and Kagan, JJ., dissenting)). That would also render service members temporarily non-deployable. *See* DoDI 6025.19, *Individual Medical Readiness Program* at para. 3.1.a.3 (classifying pregnancy and post-partum as "deployment-limiting medical condition[s]" that render service members "[n]ot [m]edically [r]eady" to deploy). All these circumstances "may impose significant costs on a Service member's physical and mental health and well-being," *DoD Memo* at 7, which could negatively impact

their ability "to perform their assigned missions," DoDI 6025.19, *Individual Medical Readiness Program* at 24.

To be sure, many women who reside in states enforcing newly stringent abortion restrictions after the Supreme Court's decision in *Dobbs* will face similar obstacles in accessing abortions. Service members, however, have far less ability than civilians to choose the state where they and their families live. Service members must go where the Department of Defense stations them. *See DoD Memo* at 7 ("Service members generally do not choose where they and their families will be stationed."). As a result, it is possible that the "costs on a Service member's physical and mental health and well-being . . . could be exacerbated in some cases by a Service member's perception that military service has limited her reproductive health care options and that the military is unable or unwilling to support her." *Id.* Where DoD stations a service member in an area with no or limited access to reproductive health care options, the service member may well view DoD itself as the major obstacle to the service member's or their family member's ability to receive care. *Cf. Harris v. McRae*, 448 U.S. 297, 315 (1980) (distinguishing between obstacles that a woman generally faces in accessing abortion and obstacles that the government itself places in her path). Such a perception may be further exacerbated by the fact that DoD does, in other contexts, offer accommodations to mitigate burdens on health care access caused by service members' assignment locations. *See* DoD Instruction 1315.19, *The Exceptional Family Member Program (EFMP)* para. 1.2 (Apr. 19, 2017) (authorizing accommodations for service members whose families include a member with special needs, including by establishing protocol "to ensure their family members' special needs are considered during the assignment process" and by allowing for possible stabilization of assignment location "for a minimum of 4 years"); *Army Directive 2022-06* at 7–8 (establishing accommodations within the Army for service members undergoing fertility treatment, as discussed above). This perception may affect not only service members' individual medical readiness, but also morale, which is an independent component of force readiness. *See* DoD Instruction 1015.10, *Military Morale, Welfare, and Recreation (MWR) Programs* para. 4 (July 6, 2009) (noting that morale, recreation, and welfare programs are intended to "maintain individual, family, and mission readiness during peacetime and in time of declared war and other contingencies").

For the above reasons, and in light of the discretion accorded to agencies to determine whether expenditures further the agency's authorized purposes, *see Employee Business Cards*, 21 Op. O.L.C. at 153, we agree that a DoD senior official could reasonably conclude that "paying for Service members to travel to obtain non-covered abortions would directly contribute to the objective of achieving and maintaining a ready force" by contributing to service members' physical and mental health and morale, *DoD Memo* at 7.

In addition, you noted that DoD's interest in military recruitment and retention could provide an alternative, independent ground for the contemplated expenditures from DoD's O&M appropriation. You have represented that "DoD also has an important interest in recruiting and maintaining the most qualified Service members." *DoD Memo* at 8. The Under Secretary of Defense for Personnel and Readiness and the Acting Assistant Secretary of Defense for Health Affairs recently testified that "women . . . volunteer at lower rates than men," and that "some potential recruits [could] feel deterred from joining the military for fear of being stationed at an installation or base" in states that severely restrict their options for reproductive health care. *Cisneros Testimony* at 3. Moreover, existing service members who are presently "living and working in states with the full range of reproductive health care available to them" may be "deter[red] . . . from remaining in . . . military service" because of the possibility of "being required to move to a state that severely restrict access to reproductive health care" and the attendant threat to their "privacy and health care choices." *Id.* You noted that DoD's interest in funding travel to pay for non-covered abortions would be especially strong if private sector employers adopt such policies, given that it may put DoD "at a distinct competitive disadvantage" if it cannot offer accommodations similar to those in the private sector, particularly given that service members, unlike civilians, "have little control" over where they live. *DoD Memo* at 8.

For these reasons, we agree with your conclusion that DoD would have discretion under the necessary expense doctrine to pay for travel for service members and dependents to obtain non-covered abortions if DoD were to "determine [that] . . . paying for Service members to travel to obtain non-covered abortions would directly contribute to the objective of recruiting and retaining a highly qualified force." *Id.*

\* \* \* \* \*

We therefore conclude that, pursuant to both express statutory authorities and the necessary expense doctrine, DoD can lawfully expend funds to pay for service members and their dependents to travel to obtain abortions that DoD itself cannot perform.

CHRISTOPHER H. SCHROEDER
*Assistant Attorney General*
*Office of Legal Counsel*